IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA          )
                                  )
            v.                    )          Criminal No. 1:18-CR-00042 (LO)
                                  )
GARY A. DUFF,                     )
                                  )
            Defendant.            )
                                  )

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through the undersigned counsel, respectfully

submits this memorandum in aid of the sentencing hearing for the defendant, Gary A. Duff

("Duff"), which is scheduled for July 6, 2018, at 9:00 a.m.

On February 12, 2018, Duff waived indictment and pled guilty to a one-count criminal

information charging him with conspiracy to defraud the United States and commit wire fraud, in

violation of 18 U.S.C. § 371.[1]  Pursuant to a plea agreement and Rule 11(c)(1)(B) of the Federal

Rules of Criminal Procedure, the parties agreed to the following:[2]  (1) Duff's base offense level

is a level 6 pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Sentencing

Guidelines") § 2B1.1(a)(2); (2) the loss amount totaled between $250,000 and $1.5 million,

---

[1]     Duff's co-conspirator, Steven J. Graves ("Graves"), pled guilty on September 20, 2017, to a two-count criminal information charging him with conspiracy to defraud the United States and commit wire fraud, in violation of 18 U.S.C. § 371, and a willful violation of the conflict of interest statute, 18 U.S.C. § 208.  On January 23, 2018, the Court sentenced Graves to 15 months imprisonment after granting a government motion.  When imposing Graves' sentence, the Court agreed with the government's loss amount calculation.

[2]     The guideline calculations set forth in the plea agreement are not binding on the Court and are offered only to assist the Court in determining the appropriate guidelines range.

thereby warranting either a 12 or 14-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1); and

(3) for restitution purposes, the Department of State ("DOS") suffered a loss of at least $250,000.

Duff is aware that if the Court accepts the parties' recommended proposals, the total

guideline calculation, when including a three-level reduction for Duff's timely acceptance of

responsibility, would be either Level 17 (24-30 months) or Level 15 (18-24 months), depending

on the calculated loss amount.  The government respectfully submits that the loss amount in this

matter is $1,372,496.61, which is the same figure that the Court adopted and applied during

Graves' sentencing hearing.  The government further requests a two-level upward adjustment for

Duff's obstructive behavior pursuant to U.S.S.G. § 3C1.1, and it recommends a term of

imprisonment within the applicable guideline range.

I.    **Factual Background**

    A.    **The Scheme to Defraud**

Duff's plea agreement incorporates a five-page statement of facts that concisely

summarizes the detailed, 24-page statement of facts to which Graves admitted.  *See United States*

*v. Steven J. Graves*, Crim. Case No. 1:17-cr-205, Dkt. 5.  As set forth in those documents, Duff

was the president and chief executive officer of a Texas construction company, Honest,

Experienced, Reliable, Contracting Solutions LLC ("HERC"), which Duff formed in March

2011.  HERC specialized in international construction projects for the U.S. government in

developing countries and military zones.  *See* Dkt. 8 (statement of facts) at ¶¶ 4-5.

Graves was a contract specialist and senior contracts administrator with DOS's Office of

Acquisitions Management ("AQM") from November 2011 to February 2013.  During this time,

Graves used his official position to steer DOS contracts to Duff and HERC while Graves, among

other things:  (a) negotiated an unsigned partnership agreement with Duff and was a silent or de

facto partner in HERC; (b) assisted HERC and Duff in obtaining start-up capital and developing business and joint venture opportunities; (c) made loans or capital contributions to Duff, some of which was used to pay HERC's contracting expenses; (d) received payments from Duff; (e) used his official position to take action upon, and make decisions and recommendations regarding, DOS procurement matters and solicitations involving HERC and Duff; (f) provided Duff, HERC, and HERC's joint venture partners with confidential bid and procurement information; and (g) participated in HERC's internal meetings, conference calls, and e-mail communications regarding business operations and development, including discussions regarding contracts that Graves oversaw in his official capacity. *Id.* at ¶¶ 3, 7.

In February 2013, Graves left DOS to become HERC's majority owner and a company executive. Graves represented HERC in communications directly with AQM contracting officials and other DOS employees concerning HERC's contract performance and payment on contracts awarded to HERC that Graves previously oversaw while at DOS. *See* Dkt. 8 at ¶¶ 8-9.

As part of the conspiracy, Duff and Graves intentionally concealed from DOS and others that Graves had a conflict of interest. While working for DOS, Graves sought out contracting opportunities for HERC and Duff, introduced Duff to DOS employees and current or prospective DOS contractors, provided advice on the preparation of bid proposals, and supplied Duff with confidential bid and procurement information. Duff and HERC used this information to gain a competitive advantage over other prospective contractors. *Id.* at ¶ 12(a)-(d).

### B.  Duff's Proffer Interview on March 10, 2016

Duff admitted as part of his guilty plea that he made false and misleading statements during a telephonic interview that was subject to a proffer agreement on March 10, 2016. Dkt. 8 at ¶ 12(e). The proffer focused on Duff and Graves' business and personal relationship and whether they had engaged in unlawful conduct. Duff was represented by counsel during the

proffer; he was advised that the proffer letter agreement required him to provide truthful information; and he was warned about the consequences of making false statements.

During the proffer, Duff denied that he and Graves had engaged in any wrongdoing, and he made exculpatory statements regarding Graves' conduct.[3] As a result, the government had to reevaluate and reexamine its existing evidence and develop additional investigative leads to assess the validity of Duff's responses.

Over the next 23 months, the government devoted a substantial amount of time, resources, and manpower to get to the truth of the matter. The prosecution team expanded to include two case agents, two prosecutors, and several analysts, paralegals, and staff members from DOS-OIG, FBI, and the U.S. Attorney's Office. Several investigative techniques were used, including witness interviews, testimony, the execution of an additional search warrant, and the gathering (and review) of financial, business, and government records that were obtained through grand jury subpoenas or voluntary document productions. A summary of these investigative steps is included in the attached declaration of one of the case agents from DOS-OIG, Assistant Special Agent in Charge Michael Speckhardt. *See* Exhibit 1.

---

[3]     Specifically, Duff falsely stated that: (a) he and Graves did not have serious discussions about Graves becoming a business partner prior to Graves' submission of his resignation to DOS in 2013; (b) Graves did not recommend HERC to others regarding DOS contracts awarded to HERC in 2012; (c) Duff never spoke with Graves about DOS contracts or asked Graves to give HERC recommendations; (d) Graves played no role with respect to a power generator contract awarded to HERC; (e) Graves never discussed competitor pricing or what cost should be submitted; and (f) Duff and Graves never discussed Duff's consulting work with a joint venture partner, and Duff did not explain to Graves his relationship with the joint venture partner. These statements are contradicted by Duff's own statement of facts (*see, e.g.*, ¶¶ 4, 7, 11-12) and numerous e-mails and documents, including those mentioned or quoted in Graves' 24-page statement of facts. *See, e.g.*, *United States v. Steven J. Graves*, Crim. Case No. 1:17-cr-205, Dkt. 5 at ¶¶ 4, 7, 11-15, 17-24, 30-49, 51-82. The government has provided a copy of the interview report to defense counsel and will have a copy available for the Court.

II.     **Argument**

    A.     **As the Court Previously Found, the Loss Amount For Guideline Purposes Is Over $1.37 Million, Warranting a 14-Level Adjustment**

The parties concur that the loss amount here is more than $250,000, but less than $1.5 million. For the reasons set forth below, the government contends that the loss amount for guideline purposes is $1,372,496.61.[4] This amount reflects the net income that HERC received on the two DOS contracts that Graves admittedly steered to Duff and HERC.

Section 2B1.1(b)(1) of the Sentencing Guidelines provides for escalating offense-level increases depending on the amount of pecuniary loss that resulted from the offense conduct. Application Note 3 explains how the amount of loss should be calculated under subsection (b)(1).[5] *See* U.S.S.G. § 2B1.1 cmt. n.3. Application Note 3 generally defines "loss" as "the greater of actual loss or intended loss," *id.* at n.3(A), and it provides that the sentencing judge "need only make a reasonable estimate of the loss." *Id.* at n.3(C). "Actual loss," which is often referred to as a "but for" loss, means "the reasonably foreseeable pecuniary harm that resulted

---

[4]     In paragraph 8 of the plea agreement (*see* Dkt. 7), the parties agreed that the restitution amount is at least $250,000. Although the government believes that the loss amount is greater than this figure, it is only seeking a restitution amount of $250,000 because: (1) it would be difficult and time-consuming to determine the exact amount of loss (above this threshold amount) with reasonable certainty; and (2) unlike the calculation for guideline purposes, the calculation for restitution must be based on actual loss and not gain received by a defendant. *E.g., United States v. Harvey*, 532 F.3d 326, 341 (4th Cir. 2008) (citing cases); *United States v. Zangari*, 677 F.3d 86, 92 (2d Cir. 2012).

[5]     An Application Note to a sentencing guideline is authoritative and binding on federal courts if it is not plainly erroneous or inconsistent with the guideline it is interpreting. *See Stinson v. United States*, 508 U.S. 36, 38 (1993); *United States v. Hudson*, 272 F.3d 260, 263 (4th Cir. 2001); *United States v. Banks,* 130 F.3d 621, 624-25 (4th Cir. 1997); *United States v. Ward*, 908 F. Supp. 350, 354 (E.D. Va. 1995).

from the offense."[6] *Id.* at n.3(A)(i). "Pecuniary harm" is defined in the guidelines as "harm that is monetary or that otherwise is readily measurable in money," which therefore excludes various forms of non-economic harm. *Id.* at n.3(A)(iii). Pecuniary harm is reasonably foreseeable if it is "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. §2B1.1, cmt. n.3(A)(iv). All reasonably foreseeable losses that flow directly, or indirectly, from a defendant's conduct should be included in the loss calculation.

Application Note 3 also includes rules of construction in certain situations. "In the case of a procurement fraud, such as a fraud affecting a defense contract award, reasonably foreseeable pecuniary harm includes the reasonably foreseeable administrative costs to the government and other participants of repeating or correcting the procurement action affected, plus any increased costs to procure the product or service involved that was reasonably foreseeable."[7] U.S.S.G. § 2B1.1, cmt. 3(A)(v)(II). Here, DOS did not repeat the procurements, since HERC provided actual performance, but DOS did incur increased costs that were reasonably foreseeable.

By issuing the contracts on a sole-source basis to a company that lacked experience and a proven track record (despite Graves' assurances to the contrary), DOS absorbed substantial cost

---

[6]     Intended loss, by contrast, is defined in the guidelines as "pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1, cmt. 3(A). The defendant's subjective intent is relevant to the intended loss inquiry.

[7]     Arguably, the contracts at issue here fall under the "benefits contract rule," *see* U.S.S.G. § 2B1.1, cmt. n.3(F)(ii), because they were both sole-sourced set aside contracts given HERC's status as a HUBZone small business. The starting point for determining loss under the "benefits contract rule" is typically the full amount of the benefits obtained. Courts have reached different conclusions as to whether set-aside contracts should be construed under the general "procurement fraud" rule or the "benefits" special rule.

overruns and additional expenses to make corrections or repairs.[8] It also potentially paid a premium on the front end to award set-aside contracts without competition.  The amount of the actual costs cannot be determined with certainty because:  (a) Graves, while laboring under his conflict of interest, ensured that there were no other bidders or normal competitive processes; (b) HERC and DOS repeatedly blamed each other for various cost overruns and performance issues, which ultimately caused DOS to compromise its position and pay substantial settlement claims, delay costs, and requests for equitable adjustments (totaling approximately $544,338.43); (c) the original award amount on each contract was increased dramatically due to post-award modifications, with a portion of these modifications appearing to address cost overruns (as opposed to ordinary changes to a project's scope); and (d) DOS reportedly received incomplete performance on one of the contracts, which caused DOS to take corrective action.  Thus, although the amount of the loss is unclear, at least a portion of the cost overruns, repairs, and corrective actions was due to HERC's inexperience and inability to perform rather than legitimate delay caused by the government.

Given the uncertainties associated with the actual costs incurred by DOS, the government submits that the more straightforward manner to assess cost in this instance is to look at the gain or net profit that HERC received from the contract awards.  The Sentencing Guidelines allow a

---

[8]     Indeed, numerous e-mails and documents reflect that HERC and DOS constantly discussed performance-related problems that were causing cost overruns and the need for corrective action.  For instance, on one of the contracts, which dealt with the supply and installation of large generators at the U.S. Embassy in Kabul, Afghanistan ("USEK"), HERC did not have the engineering experience and personnel for the installation process.  It subcontracted the installation work to a firm that was subsequently deemed inadequate.  Consequently, DOS and HERC had to use a second firm (which billed HERC $74,311.05) to make repairs and corrections and to complete the installation process.  Likewise, in 2014, DOS incurred additional costs to complete HERC's construction of a pre-fabricated building at the USEK, including electrical work and the installation of a fire suppression system.

court to use "the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1, cmt. 3(B). *See also United States v. Offill*, 666 F.3d 168, 180 (4th Cir. 2011) (using gain as an alternative measure of loss for guideline purposes in securities fraud case). In calculating gain, however, the government recognizes that there should be an offset or credit here for the fair market value of services rendered by HERC to DOS before the offense was detected. *Id.* at cmt. 3(E)(i).

Unlike the actual loss amount incurred by DOS, the net gain in this case is easy to calculate when looking at HERC's invoices, DOS's procurement files (including DOS payment records), and HERC's own QuickBooks, which set forth HERC's net profit on each contract, including each itemized modification. Graves has specifically admitted that he used his official position to assist HERC in obtaining two contracts: (1) a set-aside purchase order in which HERC, due to its HUBZone certification, was selected to construct a prefabricated building at the USEK to install radio systems in USEK vehicles (Purchase Order No. SAQMMA12C0255); and (2) a contract to supply two power generators to the USEK, which was subsequently modified to include the supply and installation of additional generators (Contract No. SAQMMA12M2357). Including modifications, it is undisputed that HERC received a gross profit of approximately $3.5 million from these two contract awards. The company's own bookkeeping also reflects that HERC received a net profit of $805,866.50 on the radio repair building purchase order and $566,630.11 on the contract to supply and install generators at the USEK. A summary of these numbers are set forth below.[9] The Court, utilizing the same numbers, previously found the loss mount in Graves' case to be $1,372,496.61.

---

[9]      The government made HERC's QuickBooks, including certain spreadsheets generated from the software, available to Duff.

| Contract | Description | Actual Revenue | Actual Costs | Profit |
|---|---|---|---|---|
| SAQMMA12M2357 | Engines | $ 2,265,220.43 | $ 1,459,353.93 | $ 805,866.50 |
| SAQMMA12C0255 | Radio Shop | $ 1,254,030.05 | $ 687,399.94 | $ 566,630.11 |
| Total | | $ 3,519,250.48 | $ 2,146,753.87 | $ 1,372,496.61 |

**B.**  **Duff Obstructed the Investigation Into Graves and Duff's Misconduct, Thereby Warranting a Two-Level Enhancement Under U.S.S.G. § 3C1.1**

Because Duff significantly obstructed, hindered, and impeded the administration of justice, the government respectfully requests that the Court apply a two-level adjustment pursuant to U.S.S.G. § 3C1.1.

Section 3C1.1 contemplates varying degrees of obstructive conduct and corresponding sanctions.  Although unsworn false statements to law enforcement officers are generally not covered by U.S.S.G. § 3C1.1, Application Note 4(G) states that the adjustment applies when the defendant "provid[es] a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense."[10]  *Id.*  Materiality is a "conspicuously low" bar under § 3C1.1, *United States v. Gormley*, 201 F.3d 290, 294 (4th Cir. 2000) (internal marks omitted), and it only requires that the statement, "if believed, would tend to influence or affect the issue under determination."  U.S.S.G. § 3C1.1, cmt. n.6. *See also United States v. Ortiz-Rodriguez*, 702 F. App'x 117, 119 (4th Cir. 2017) (unpublished); *United States v. Hill*, 664 F. App'x 341, 344 (4th Cir. Nov. 29, 2016) (unpublished).

Duff's false statements in this case are material and significant, and they fall squarely within the exception.  The government wasted nearly two years disproving Duff's lies.  As noted in Agent Speckhardt's declaration, had Duff implicated Graves from the get-go (as he now has in his statement of facts), the government could have truncated its investigation of Graves and

---

[10]    Although the adjustment typically does not apply to unsworn false statements to law enforcement officers that are either immaterial or insignificant, such false statements can nonetheless serve as a basis for "a greater sentence within the otherwise applicable guidelines range."  U.S.S.G. § 3C1.1, cmt. n.5.

resolved his liability in a far more efficient and expeditious manner.  Moreover, had Duff simply

provided truthful and complete information—as he was required to do under the terms of the

proffer agreement—the government would have saved an enormous amount of time, resources,

manpower, and effort, all of which it could have devoted to other investigations and cases.

The government anticipates Duff will argue that:  (1) he merely denied his guilt during

the proffer; (2) his efforts to thwart the investigation were ultimately unsuccessful; and (3) his

false statements were not that impactful or material.  These arguments, if raised, are meritless.

First, although a defendant's mere denial of guilt is typically an insufficient basis for

applying the adjustment, *see* U.S.S.G. § 3C1.1, cmt. n. 2, caselaw in this circuit[11] and

elsewhere[12] makes clear that materially false statements that hinder an investigation and cause

the government to waste time, resources, or manpower can be a basis for an enhancement under

U.S.S.G. § 3C1.1.  For instance, in *United States v. Pouncy*, 71 F. App'x 229, 230 (4th Cir.

2003) (unpublished), the defendant lied when he initially told ATF agents that firearms he had

---

[11]     *See, e.g.*, *United States v. Pouncy*, 71 F. App'x 229, 230 (4th Cir. 2003) (unpublished)
(defendant's lies caused ATF agents to waste time and resources); *United States v. Hill*, 664 F.
App'x 341, 343 (4th Cir. 2016) (unpublished) (defendant obstructed investigation by, among
other things, making "material misrepresentations" to case agent that "obstructed the
investigation . . . and hindered it" because the misrepresentations bought the defendant additional
time to destroy evidence and cover her tracks); *United States v. Simmons*, 186 Fed. Appx. 357,
359 (4th Cir. 2006) (unpublished) (affirming district court's application of obstruction
enhancement where the defendant provided false identification to law enforcement officials on
more than one occasion, thereby causing a multi-month delay in his arrest).

[12]     *E.g.*, *United States v. Francis*, 39 F.3d 803, 811 (7th Cir. 1994) (obstruction enhancement
proper where the defendant's retraction of information previously given about co-conspirators
caused government to reinvestigate and reevaluate its case, thereby impeding its investigation
and prosecution); *United States v. Selvie*, 684 F.3d 679, 684 (7th Cir. 2012) (applying adjustment
where defendant told witnesses to lie to officers, which caused the police to launch an
investigation, conduct interview(s), and expend time and manpower to vet false allegations);
*United States v. Hawkins*, No. 08-CR-66-LRR, 2009 WL 2253188, at *10 (N.D. Iowa July 28,
2009) ("By leading law enforcement to believe that he was not involved in the robbery,
[Hawkins] cost the government valuable time, manpower and other resources.").

purchased in West Virginia were stolen from a truck in that jurisdiction.  Over a year later, the

defendant admitted the guns were stolen from his car in Detroit, Michigan.  After the district

court applied the obstruction enhancement, the Fourth Circuit affirmed, explaining that the ATF

agents "spent resources and time developing leads and attempting to locate the guns in West

Virginia, where [the defendant] initially told them they were stolen.  If ATF agents had the

correct information that the guns had been stolen in Detroit, their investigation would not have

been so impeded." *Id.* at 230-31.

Second, courts have routinely found that a false statement regarding the culpability of a

co-defendant is sufficient to support the enhancement.  *See United States v. Edwards*, No. 99-

4082, 1999 WL 645119, at *3 (4th Cir. Aug. 25, 1999) (unpublished) (applying enhancement

where defendant withheld information in proffer interview that implicate co-defendant); *United

States v. Diaz*, 195 F. App'x 124 (4th Cir. 2006) (unpublished) ("A false statement regarding the

culpability of a co-defendant is sufficient to support the enhancement." (citing *United States v.

Kiulin*, 360 F.3d 456, 460 (4th Cir. 2004)); *Ortiz-Rodriguez*, 702 F. App'x at 119 (district court's

application of obstruction enhancement was not clearly erroneous where the defendant, during

trial preparation session, denied co-defendant's involvement in conspiracy, which caused the

government to make *Giglio* disclosure).

Third, whether Duff's false statements successfully obstructed the investigation or

whether the case agents were ultimately led astray is not determinative.  *United States v. Hicks*,

948 F.2d 877, 886 (4th Cir. 1991) ("defendant need not be successful in obstructing justice

through the false statement, since § 3C1.1 encompasses attempts to obstruct justice as well as

actual obstruction."); *United States v. Dowd*, 4 F. App'x  193, 195 (4th Cir. 2001) (unpublished)

(obstruction adjustment was appropriate even if investigators were not significantly misled by a

defendant's false alibi); *Pouncy*, 71 F. App'x at 230-31 (ignoring defendant's argument that the ATF agents would not have identified the guns any faster if he had told them the truth). The key question is whether the unsworn false statements significantly hindered the investigation. And here, there is no doubt. Duff's lies caused the prosecution team to divert and squander substantial resources. His lies were not a simple denial of guilt, nor were they the result of confusion, faulty memory, a mistake of fact, or being surprised or "caught off guard." Duff was represented by counsel, he understood the terms of the proffer agreement, and he knew the importance of telling the whole truth during the interview. Despite knowing the consequences, Duff made a calculated decision to exculpate himself and Graves and mislead the prosecution. His willfulness warrants a two-level adjustment.

### C.    Duff Should Not Receive a Downward Variance

Even if the Court denies our request to enhance Duff's guideline calculation, his obstructive behavior calls for "a greater sentence within the otherwise applicable guidelines range." U.S.S.G. § 3C1.1, cmt. n.5. Duff has not cooperated with the government's investigation, and he has been recalcitrant.

There is also no sentencing factor weighing in Duff's favor when considering 18 U.S.C. § 3553(a). Duff's admissions, as well as the voluminous investigative record, demonstrate that he and Graves profoundly abused the public's trust. The procurement fraud scheme executed here is perhaps the most insidious type because it is difficult to detect. Graves' position afforded him considerable discretion and latitude when exercising his official duties concerning large, multi-million dollar contracts. He was entrusted to negotiate and acquire a substantial amount of materials, supplies, and construction services for DOS so that DOS could fulfill its mission in warzone areas and developing countries.

Duff and Graves exploited the fact that Graves was required to negotiate with vendors in a fast-paced working environment with limited oversight. Over a multi-year period, Duff and Graves sought to defraud DOS by steering contracts to HERC, Graves, and Duff. The co-conspirators took substantial steps to conceal their illicit activity and Graves' conflict of interest. Under the circumstances, applying a sentence within the applicable guideline range is sufficient, but not greater than necessary, to comply with the purposes set forth in section 3553(a). Anything less would not adequately reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, or adequately deter other procurement officials from engaging in similar deceit and fraud.

## III.   Conclusion

For the foregoing reasons, the government respectfully submits that Duff is not entitled to a downward variance under section 3553(a) and the Court should: (1) calculate a total offense level based on a loss amount of $1,372,496.61; (2) apply an obstruction enhancement; and (3) issue a restitution order in the amount of $250,000.

G. Zachary Terwilliger
United States Attorney

By: _____

Edward P. Sullivan
Special Assistant United States Attorney (LT)
Jack Hanly
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3700
Fax: (703) 299-3981
Edward.P.Sullivan@usdoj.gov
Jack.Hanly@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to the attorney of

record for the defendant.

Edward P. Sullivan
Special Assistant United States Attorney (LT)


Dated:  June 29, 2018